FLORENCE L. RISK, Appellant, *v.* JAMES RISK, Respondent.

First Department, July 14, 1922.

Husband and wife — separation — action by wife based on abandonment — defense of justification based on refusal of marital intercourse — burden rests on defendant — testimony of plaintiff denying refusal corroborated by defendant's letters written before marriage — witnesses — defendant's testimony discredited by admitted false swearing — finding that defendant insisted on marital rights and plaintiff refused contrary to evidence — refusal by wife of marital intercourse not justification for abandonment by husband nor does it constitute abandonment by wife.

In an action for separation brought by a wife on the ground of abandonment in which the defendant interposes a defense of justification based on the refusal of marital intercourse by the wife the burden is on the defendant to prove his defense of justification.

The testimony of the plaintiff denying refusal of marital intercourse was corroborated materially by letters written by the defendant prior to marriage indicating no expectation of such intercourse.

Furthermore, the testimony by the defendant in support of his defense was materially weakened by his admission that he had sworn falsely on two occasions concerning the relations of himself and his wife.

Finding by the trial court that the defendant insisted on marital intercourse with the plaintiff and that she refused to comply with his request is contrary to the evidence.

The refusal by a wife of marital intercourse is not sufficient to justify the husband in abandoning her and does not constitute abandonment on the part of the wife, for the term "abandonment" contemplates a voluntary separation of one party from the other without justification, with the intention of not returning, and has never been extended to a temporary withdrawal or any partial failure to perform the obligations of the marital contract.

LAUGHLIN and DOWLING, JJ., dissent.

First Department, July, 1922.      [Vol. 202

APPEAL by the plaintiff, Florence L. Risk, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 9th day of June, 1921, upon the decision of the court rendered after a trial at the New York Special Term.

_Henry W. Hardon,_ for the appellant.

_Peck & Schmidt_ [_Jerome A. Peck_ of counsel; _Frederick G. Schmidt_ with him on the brief], for the respondent.

PAGE, J.:

The action was brought by the wife against the husband for a judgment of separation and for maintenance and support. The abandonment of the plaintiff by the defendant is admitted. The court found " that during the married life of the parties the defendant insisted upon his marital rights and the plaintiff refused to permit the same and denied his right thereto; " and as conclusions of law, " that the refusal of the plaintiff to permit the defendant to have sexual intercourse with her during their married life is and was sufficient cause for the refusal of the defendant longer to live with the plaintiff, and he was justified in refusing longer to live with her. That the defendant has not deserted or abandoned the plaintiff without sufficient cause; " and directed judgment dismissing the complaint upon the merits.

The parties were married June 1, 1920. At the time of the marriage the plaintiff was forty and the defendant sixty-seven years of age. The plaintiff had been twice married and widowed. The defendant was a bachelor. Shortly after their first meeting the defendant wrote the plaintiff that he was " busy with new thoughts suddenly awakened * * *. But with them came other thoughts such as, you silly old man, how do you expect to blend December and June when there is snow on the mountains and sunshine in the valley? I don't! They are simply the reflections of one who has gone further up the mountain as he wistfully glances an appreciative into the valley." Within two weeks after their first meeting the defendant handed to the plaintiff a written proposal of marriage, in which he referred to a former tentative proposal and continued: " The troubled thought in my mind at that time was the disparity in our ages. You are in the hey-day of your womanhood, while I have passed the best years of my vigor. * * * . I am not going to urge you to accept me, for I have doubts and misgivings of my own, not concerning you but myself. * * * In asking you to come to me it is with the desire to share with you the fruits of a long active business life. * * * The love of your youth that you gave to another in

marriage will always remain a sacred memory to you. The love I offer is that of companionship, of the comradeship of later life."

The next day he wrote of this formal letter of proposal, " Perhaps it lacked the warmth of a more ardent lover? I cannot give you the strength and vigor of a more intense man, I can only give you the best I have to offer, myself. You and I are no longer children and know that there are other things in life than love and kisses, and it is these other things I hope to be able to give you." In a later letter he wrote: " I know how unfit I am in many ways, nature has partially disqualified me for giving you the happiness that you have the right to expect, but love has greater significance than that. The tenderness, the sympathy, the moral support, of a good man, if I am such, means much to a good woman. I am writing these things candidly and honestly, for that is the right way, and you have been honest with me. I fully understand that you do not love me, but I know that you want to marry me, with the hope, and conviction that out of it all will surely grow the ideal you desire." Five days before the wedding ceremony he wrote: " I am keenly conscious of the fact that I cannot give you the strength and vigor of my younger manhood, but somehow I feel that I can give something that is really of greater value, a steadfastness of protection and an assurance of kindness that will never grow cold in the giv'ng. I sometimes wonder if you care for me more now than when you consented to be my wife? I am not foolish enough to believe that you accepted me because you loved me, but I am foolish enough to hope that the faith and belief that guided you then has grown into something that touches the border land of that mysterious thing called love and given you an assurance that the man of your choice can be trusted with your future happiness.

> " ' Come grow old along with me,
>    The best is yet to be,
>    The last of life, for which the first was made,
>    Our times are in his hand ,
>    Who saith, a whole I planned
>    Youth shows but half, trust God, see all, nor be afraid.' "

When we consider that these expressions were written by a man who was within three years of the allotted three score years and ten of man's life to a woman of forty, who had experience in married life, it is difficult to think that any other meaning was intended to be conveyed than that which the plaintiff says she understood, and which the defendant stated to her, that he realized he was growing old, that he was lonely, that he had never had a home, that he had always lived in a boarding house or hotel, that he

longed for the companionship and comfort of a home, that he wanted some one who could be a companion who would look out for his comfort, take care of him when he was ill, and in every way be a comrade and a companion. She further testified that he had offered to give her an ante-nuptial settlement of $100,000, saying that it was all up to her to have a pre-nuptial settlement or, if she wished to intrust the future in his hands, that he would take care of it, and she refused the settlement and they discussed their future, their home and money matters; on leaving he placed his hands on her shoulders and said that he had tried, as delicately as possible, to convey to her something that was on his mind and he said: " I cannot give you the sexual love that you have a right to expect, but I will try in every way to make you as happy as I can." She further testified that after they went to live together in the house at Stamford, he again told her that the relation of husband and wife could not be a part of his life; that he never made any effort or suggestion or attempt in any way, directly or indirectly, in that direction, nor was there any refusal on her part; that her bedroom was never locked, and always accessible to him. The only evidence that the defendant gave of the plaintiff's refusal was that on the first night that they were at Stamford, she refused his request, and gave a physical reason; that shortly thereafter, she asked him to wait until they were better acquainted, and four days thereafter he entered her room partly clothed and she turned away from him with a look of aversion, and that he had made no further effort or request.

The burden was on the defendant to prove his defense of justification. The matter is of such an intimate character that necessarily the direct testimony must be oath against oath of the parties. In such circumstances writings made before the controversy have great weight in determining where the truth lies. In my opinion the letters of the defendant written before the marriage tend strongly to corroborate the plaintiff's testimony. Furthermore, the defendant in his sworn answer made serious charges against the plaintiff which he admitted upon the witness stand were without foundation in fact. In resisting the motion for counsel fee, the defendant in his affidavit drew a pitiful picture of a bridegroom deserted on his wedding night, as follows: " After the wedding she, and her mother and brother and I went to New York and had dinner together, and then to my surprise, I was completely stupefied and made speechless when she told me of her plan to return to her own home in Brooklyn that night and said that I could go to Stamford to the house which I had purchased for her in that city; she left the dinner with her mother, brother and the rector, and

I was left alone on my wedding night." On the witness stand he testified that the house in Stamford was undergoing repairs and was not inhabitable at the time of the wedding, and that it was mutually arranged between them, a week before the wedding, that she should continue to live in her apartment in Brooklyn, and that he would push the work on the house in Stamford, and that she was to come there when he sent for her, which she did, and that it was in accordance with this prearranged plan that she returned to Brooklyn. Nor was he left sitting alone at the deserted wedding feast. The defendant in lieu of a honeymoon trip took the whole party of five upon a ride on top of a Fifth avenue stage to the end of the line and back, at an expense of one dollar. He left the stage at One Hundred and Tenth street and returned to his apartment. These two incidents of admitted false swearing show such a disregard of the sanctions of an oath as to deprive his testimony of much probative value.

The fact was that prior to the marriage the defendant had become convinced that he had made a mistake, and he wrote a letter to the plaintiff, breaking the engagement, but carried it in his pocket and finally destroyed it. He admitted that he was restrained from sending it for fear of an action for breach of promise. His " Scotch shrewdness," of which he boasted, suggested that it was cheaper to get rid of a wife than a *fiancée*. Within twenty-four hours after the parties had commenced living together the defendant informed the plaintiff that he had gone through the form and ceremony of marriage with the intention of dissolving the marriage immediately. He had promised to give the house in Stamford to his wife as a wedding present. He neglected to do so, and shortly after the marriage he wrote his wife: " I promised to deed the property to you as a wedding gift, it was no design on my part that it was not done, but perhaps my good fortune. Fortunately also a man can sell his property in Conn. without the consent of his wife. I have no desire to do either providing we can fix up some satisfactory arrangement of a final separation." The plaintiff consulted a lawyer, and after an interview with him the defendant executed a deed of the property, but did not satisfy the mortgage, which was a lien upon it. It seems also that he met at this time with financial losses, and in less than four months after the marriage deliberately abandoned the plaintiff, and shortly thereafter ceased to contribute to her support. In my opinion the finding that the defendant insisted on his marital rights and the plaintiff refused to permit the same and denied his right thereto was against the weight and contrary to the evidence.

If, however, the facts were as found, they were insufficient to justify the abandonment of the plaintiff by the defendant. In my

opinion acts justifying desertion must be such as would support a decree of divorce or separation. (*Underwood* v. *Underwood,* 271 Fed. Rep. 553, 554.) Whether the refusal of marital intercourse, without sufficient reason, without the withdrawal of general cohabitation, constitutes abandonment which would support a cause of action for a divorce *a vinculo* or *a mensa et thoro,* has been differently determined in several of the States, and never has been decided authoritatively in this State. In the following cases decrees granted on that ground were sustained: *Parmly* v. *Parmly* (90 N. J. Eq. 490); *Fink* v. *Fink* (137 Cal. 559); *Axton* v. *Axton* (182 Ky. 286; 206 S. W. Rep. 480); *Whitfield* v. *Whitfield* (89 Ga. 471); *Pinnebad* v. *Pinnebad* (134 id. 496); *Baker* v. *Baker* (99 Ore. 213; 195 Pac. Rep. 347). The courts of Virginia have expressed doubt whether it would be a sufficient ground but have not decided the question, as there were other sufficient grounds for the decree in the cases under consideration. (*Throckmorton* v. *Throckmorton,* 86 Va. 768, 777; *Ringgold* v. *Ringgold,* 128 id. 485; 104 S. E. Rep. 836, 840.) The great weight of authority supports the rule that the refusal of marital intercourse is neither a ground for annulment of the marriage, divorce or separation, nor a justification for abandonment or other marital misconduct by the other party. (See *Cowles* v. *Cowles,* 112 Mass. 298; *Sasserno* v. *Sasserno,* —— id. ——; 134 N. E. Rep. 239; *Stewart* v. *Stewart,* 78 Me. 548; *Pratt* v. *Pratt,* 75 Vt. 432; *Underwood* v. *Underwood,* 271 Fed. Rep. [D. C.] 553; *Reynolds* v. *Reynolds,* 68 W. Va. 15; *Wills* v. *Wills,* 74 id. 709; *Fritz* v. *Fritz,* 138 Ill. 436; *Pfannebecker* v. *Pfannebecker,* 133 Iowa, 425; *Segelbaum* v. *Segelbaum,* 39 Minn. 258; *Schoessow* v. *Schoessow,* 83 Wis. 553.)

The courts which have granted decrees have treated the refusal as a desertion. They have held that such refusal was not cruel or inhuman treatment. In this State abandonment is a ground for the granting of a judgment of separation. (Civil Practice Act, § 1161, subd. 3; Code Civ. Proc. § 1762, subd. 3.) As used in our statute, the term " abandonment " " contemplates a voluntary separation of one party from the other without justification, with the intention of not returning " (*Williams* v. *Williams,* 130 N. Y. 193, 197), and has never been extended to a temporary withdrawal or any partial failure to perform the obligations of the marital contract. In those States that have sustained decrees granted on this ground, the divorce laws are not so strict as they are in this State. I can see no reason why they should be followed against the greater weight of authority.

In my opinion, therefore, the judgment and the third and ninth findings of fact and the conclusions of law should be reversed, with costs, and judgment of separation granted for the plaintiff, and the matter remitted to the Special Term to fix the alimony,

unless the parties can agree on the amount thereof, in which case findings may be made and judgment directed by this court.

CLARKE, P. J., and MERRELL, J., concur; LAUGHLIN and DOWLING, JJ., dissent.

Judgment reversed, with costs, and judgment of separation granted to plaintiff, and the matter remitted to the Special Term to fix alimony, unless the parties can agree on the amount thereof. Settle order on notice.